# IN THE COURT OF APPEALS OF IOWA

No. 21-1378
Filed July 20, 2022

**RENAE E. HINDMAN,**
        Plaintiff-Appellant,

**vs.**

**BRIAN E. HINDMAN and CODY E. HINDMAN,**
        Defendants-Appellees.
_____

Appeal from the Iowa District Court for Monroe County, Gregory Milani, Judge.

A plaintiff appeals the dismissal of a petition to void the transfer of a farm and award her damages for fraudulent misrepresentation and undue influence. **AFFIRMED**.

Paul Zingg and Alec J. Maas of Denefe, Gardner & Zingg, P.C., Ottumwa, for appellant.

Matthew B. Moore of The Law Offices of Matthew B. Moore, PLLC, and Randall C. Stravers of Stravers Law Firm, Oskaloosa, for appellees.

Heard by Vaitheswaran, P.J., and Tabor and Badding, JJ.

**BADDING, Judge.**

Fifth-generation farmer Brian Hindman and his wife, Renae Hindman, transferred a farm operation valued at $2,485,000 to their son Cody Hindman for $850,000.  Five months later, Brian filed for divorce.  Renae sued Brian and Cody for fraudulent misrepresentation and undue influence, seeking damages for both claims.  She also sought to void the transfer of the farm under Iowa Code chapter 684 (2019), the Iowa Uniform Voidable Transactions Act.  The district court dismissed her claims following a bench trial.  Renae appeals.

## I.    Background Facts and Proceedings

Renae and Brian Hindman married in June 1994.  In 1996, Brian's parents conveyed an approximately 373-acre farm to Brian and Renae for $198,500.  The remaining value of the farm was gifted to the couple because Brian's parents wanted to see them continue the family-farming tradition.

For most of their marriage, Brian operated the farm while Renae worked as a special-education teacher.  In 2017, Renae stopped working and applied for social security disability benefits due to multiple health conditions, including fibromyalgia, lymphedema, obstructive sleep apnea, and chronic pain, along with depression and anxiety.  Brian also suffered from some health problems, most seriously prostate cancer and "compartment syndrome," where "the skin . . . pull[ed] away from the muscle" in his leg.  The latter condition required surgery that cut his leg from his knee to ankle "clear to [the] bone."  He was hospitalized for more than a week after the surgery and has ongoing pain in his leg.

The couple's oldest child, Cody, helped his father and grandfather on the farm since he was young.  By the time he was nineteen years old, Cody had forty

cows of his own, along with pasture and hay ground that he rented. In the fall of 2017, Cody located a farm he was ready to purchase. Around the same time, Brian started talking to Renae about how he was "burnt out" on farming. He told her the financial part of the operation was simply too stressful for him, especially coupled with his health problems. In April or May 2018, the couple approached Cody about buying their farm instead of the one he was considering so that they could move into town and find Brian a traditional "nine-to-five job."

In the midst of these discussions, Brian called attorney Pat Curran for advice about the farm, specifically whether bankruptcy would be an option that would allow him to keep the farm while getting rid of the debt or whether it would be better to sell the farm to Cody. Both Brian and Curran testified[1] that the subject of divorce did not come up in their conversations. Instead, Brian told Curran that he was overwhelmed by the farm's finances, specifically a loan on the farm he and Renae took out in June 2015 for $348,270.17. The balance on the loan was due in ten years, but by the beginning of 2018, they owed more on the note than they

---

[1] Curran was deposed before trial but did not testify at trial. Although Curran's deposition testimony was referenced throughout trial and considered by the district court, the transcript does not show that the deposition transcript was offered or admitted as an exhibit. As a result, it is not in the exhibit binder transferred to our court. Portions of the deposition were included in the appendix, but because the deposition is not part of the trial court record before us, we have not considered those portions. *See* Iowa Rs. App. P. 6.801 ("Only the original documents and exhibits filed in the district court case from which the appeal is taken, the transcript of proceedings, if any and a certified copy of the related docket and court calendar entries prepared by the clerk of the district court constitute the record on appeal."); 6.905(1)(b) (stating contents of the appendix are limited to parts of the district court record); *In re Marriage of Keith*, 513 N.W.2d 769, 771 (Iowa 1994) ("We are limited to the record before us and any matters outside the record on appeal are disregarded."). Any references to Curran's testimony in our opinion come from questions other witnesses were asked at trial about his deposition testimony.

originally had—$379,126.73. Brian was able to reduce the debt to $307,126.73 in February 2018 by applying a $72,000 inheritance he received to the note. But several months later, the loan balance was back up to almost $350,000. Brian blamed their inability to reduce the debt on Renae's out-of-control spending. He was concerned that when the note came due, the loan would be "capped out" at its $600,000 limit, he "wouldn't have . . . money to put a crop in," and the farm would have to be sold to an outside party. Brian testified he was "just overwhelmed with the debt."

After talking with Curran, Brian discovered that bankruptcy was not an option that would allow him to preserve the farm. So, he decided the best plan would be to sell the farm to Cody, which would allow him to keep the farm in the family while getting some money to pay off its debt and start fresh in town with Renae. Because Curran was wanting to retire, Brian and Renae decided to consult the attorney who had assisted them when they purchased the farm from Brian's parents—John Pabst.

Pabst testified the couple's end goal was to transfer the farm to Cody with as little tax liability as possible, while coming away with $500,000 at the end of the transaction after paying off the debt on the farm. To accomplish this goal, Pabst, with assistance from Brian and Renae's accountant, recommended that they sell the farm homestead to Cody for $850,000. The remaining value of the land, livestock, equipment, and related assets would be gifted to Cody. Because the entire operation was valued at $2,485,000, this resulted in a $1,635,000 gift to Cody. After several meetings with both of his parents, Cody agreed to this plan.

The closing, which Renae attended with Brian and Cody, took place on June 15, 2018. Three days later, Brian called Curran's office after he received a call from a bill collector on a past-due medical bill he felt Renae should have paid. He says the purpose of this call was to again talk to Curran about the couple's debt and Renae's spending habits. They scheduled a meeting for mid-July. Meanwhile, according to Brian's testimony, he was "hit with" bills for Renae's credit cards, on top of continuing calls from bill collectors. At the July meeting, which Renae did not know about, Brian testified Curran told him that he had two choices with the debt: "live with it or get rid of it." After thinking it over for several months, Brian chose to get rid of it, serving Renae with a petition for dissolution of marriage in November 2018. Because the couple had transferred the farm to Cody, their marital assets were mostly reduced to what was left from the sale proceeds—$438,000 according to Brian's January 2019 financial affidavit from the divorce proceeding.

Renae filed suit against both Brian and Cody in May 2019, alleging the pair colluded to secure the transfer of the farm to purposefully reduce the value of the marital estate before Brian began divorce proceedings. She also argued the facts of the conveyance were intentionally misrepresented to her and that Brian exercised undue influence over her to secure her assent to the sale of the farm. Brian filed libel and slander counterclaims against her, and Cody counterclaimed for slander of title and quiet title.

At trial, Renae testified that she was not included in any meetings or discussions with either Pabst or the accountant before the June 15 closing. But Pabst said that in the days leading up to the closing, Renae was "extremely helpful"

in getting him information about the loan payoff and wiring instructions. Renae also testified at trial that she never saw the purchase agreements, bill of sale, and related transfer documents until the closing. The couple's daughter, however, testified about seeing her father and brother with "papers in their hand," "going back and forth between the living room and [her mother's] bedroom" in late May or June. And Pabst testified that he mailed drafts of the closing documents to the couple's home a few days before the closing with a letter carefully laying out the particulars of the transaction. He also spent an hour or two reviewing the documents with Brian and Renae at the closing, giving them a chance to ask any questions they may have had. Renae did not have any.

Following a bench trial, the district court dismissed Renae's petition and all counterclaims against her. Renae then moved for a new trial under Iowa Rule of Civil Procedure 1.1004. After her motion was denied, Renae appealed.

## II. Standard of Review

The parties agree the standard of review on the intentional-misrepresentation claim is for legal error, *see Punelli v. Punelli*, 346 N.W.2d 259, 261 (Iowa Ct. App. 1984), but they disagree about how we should review the voidable-transaction and undue-influence claims. Renae contends we should review those claims de novo, citing *Algreen v. Gardner*, a fraudulent-transfer case under Iowa Code chapter 684 (2016). No. 17-0104, 2018 WL 3057438, at *2 (Iowa Ct. App. June 20, 2019) ("This case was tried in equity, and our review is de novo."). Brian and Cody, on the other hand, argue our review should be for correction of errors at law because the case was tried at law.

"Our review of a decision by the district court following a bench trial depends upon the manner in which the case was tried to the court." *Dix v. Casey's Gen. Stores, Inc.*, 961 N.W.2d 671, 680 (Iowa 2021) (citation omitted). "To determine a proceeding as legal or equitable, we look to the pleadings, relief sought, and nature of the case." *Id.* (citation omitted). With competing indicators on both sides, we elect to review these claims de novo because we would reach the same result if we were reviewing for correction of errors at law. *See Albert v. Conger*, 886 N.W.2d 887, 880 (Iowa Ct. App. Aug. 17, 2016); *see also Ralfs v. Mowry*, 586 N.W.2d 369, 371 (Iowa 1998) (noting a de novo review was not prevented when the court ruled on objections because neither party claimed evidence was improperly excluded).

"But, a de novo review does not mean the appellate courts decide the case in a vacuum, or approach it as though the trial court had never been involved." *Albert*, 886 N.W.2d at 880 (cleaned up). Instead, even with a de novo review, "great weight" is afforded to the findings of the district court where the testimony is conflicting since the trial judge "is in the best position to assess the witnesses' interest in the trial, their motive, candor, bias, and prejudice." *Id.*

### III. Analysis

#### A. Voidable Transaction under Chapter 684

The Iowa Uniform Voidable Transactions Act allows two types of transfers to be voided:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation under any of the following circumstances:

> a. With actual intent to hinder, delay, or defraud any creditor of the debtor.
> b. Without receiving a reasonably equivalent value in exchange for the transfer or obligation, if either of the following applies:
> (1) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
> (2) The debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Iowa Code § 684.4(1) (2019); *see also Algreen*, 2018 WL 3057438, at *3.

The district court found Renae was a "future creditor" of Brian because of the divorce proceeding but determined she failed to prove the sale of the farm fit within either of the above alternatives. *See* Iowa Code § 684.1(3) (broadly defining "claim"), (4) (defining "creditor" to mean "a person that has a claim"). On appeal, Renae mainly focuses on the first type of voidable transfer—those made with the actual intent to defraud—and asserts the court erred in (1) applying the wrong evidentiary standard; (2) failing to apply the factors set forth in section 684.4(2) to determine actual intent under section 684.4(1)(a); and (3) making certain factual errors.

Renae's first argument fails from the starting gates. In denying her voidable-transaction claim, the court found she "failed to produce *adequate* evidence that there was any plan or scheme by Brian and/or Cody to transfer the property to Cody with the intent of ensuring the farm would not be subject to the dissolution property division." (Emphasis added.) Renae takes this to mean that the court did not apply the preponderance-of-the-evidence standard required by section 684.4(3). But in its order denying Renae's motion for new trial, the court

specifically stated that she "failed to meet her burden to provide a preponderance of the evidence." And even without that explicit statement, the preponderance standard was implicit in the court's ruling on the voidable-transaction claim. *See Oehlert v. Campbell*, No. 08-1450, 2009 WL 2169018, at *3 (Iowa Ct. App. July 22, 2009). We accordingly reject this argument.

Taking Renae's last two arguments out of order, we observe that any "error" in the court's factual findings is simply the result of the court's following credibility findings against her:

> Those instances where the findings of fact are contrary to those set forth by Renae, the court determined that Renae's testimony was not credible. The court had three days of opportunity to observe Renae in the courtroom and three days of opportunity to carefully listen to all of the witnesses, review the exhibits, and consider the likelihood of Renae's version of the facts having actually occurred. There were multiple occasions during Renae's testimony that she testified contrary to the testimony of many of the witnesses. Additionally, there were often statements made by Renae that the court finds were not credible due to lack of support in the record.

We defer to these findings, which guide our resolution of Renae's main argument—that the court failed to apply the factors set forth in section 684.4(2) in evaluating her voidable-transfer claim. *See Albert*, 886 N.W.2d at 880.

Turning to that argument, section 684.4(2) lists factors that may be considered in determining actual intent under section 684.4(1)(a). These factors are sometimes called "indicia of fraud" or "badges of fraud."[2] *See Algreen*, 2018

---

[2] They include whether:
 a. The transfer or obligation was to an insider.
 b. The debtor retained possession or control of the property transferred after the transfer.
 c. The transfer or obligation was disclosed or concealed.
 d. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

WL 3057438, at *3. They represent "circumstances that so frequently accompany fraudulent transfers that their presence gives rise to an inference of intent. The test is whether there is a satisfactory explanation for the circumstance." *Id.* (citation omitted).

Renae asserts the district court did not consider the following "badges of fraud" showing that Brian and Cody intended to defraud her with the transfer of the farm: "the transfer was to an insider; Brian retained possession or control of the property after the transfer; the future obligation was concealed; the transfer was substantially all of Brian and Renae's marital assets; and the transfer occurred shortly before a substantial debt was owed." *See* Iowa Code § 684.4(2)(a), (b), (c), (e), (j). But the court did consider each of these factors; it just resolved most of them adversely to Renae, as do we.

At the outset, we agree with Renae that the court "incorrectly concluded Cody was not an insider." As Brian's son, he meets the definition of an insider under section 684.1(8)(a)(1).[3] But that factor alone does not mean the transfer

---

e. The transfer was of substantially all the debtor's assets.
f. The debtor absconded.
g. The debtor removed or concealed assets.
h. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
i. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
j. The transfer occurred shortly before or shortly after a substantial debt was incurred.
k. The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

Iowa Code § 684.4(2)(a)–(k).

[3] This provision states that an individual who is a "relative of the debtor" is an "insider." Iowa Code § 684.1(8)(a)(1).

was made with the actual intent to defraud Renae. *See id.* § 684.4(2) ("In determining actual intent under subsection 1, paragraph 'a', consideration *may* be given, *among other factors*, to whether any or all of the following apply. . . ." (emphasis added)).

Recognizing this, Renae points to the fact that Cody employed Brian on the farm after the transfer as evidence that Brian "retained possession or control of the property." *See id.* § 684.4(2)(b). The court, however, found that "Cody's explanation regarding his need to employ 'someone' was credible." We agree with the court that the evidence showed "Brian was simply an employee of Cody; he had no right or authority to use any of the assets for his own benefit. It was clear that Cody had absolute use of the assets as he used them as collateral and eventually evicted Brian" and Renae from the farmhouse. Brian testified that once Cody took over the farm, the "responsibilities changed. [Cody] was in charge of getting the seed, getting the beans, getting it planted." Cody confirmed that his father doesn't control what he does on the farm; instead, Cody tells Brian "what needs done that day, and [they] get it done." Thus, this factor does not cut in Renae's favor.

The third indicia of fraud cited by Renae is her contention that "Brian, at the time of the transfer, intentionally concealed from Renae the fact he was anticipating the [d]issolution of [m]arriage action." *See id.* § 684.4(2)(c). In support, Renae relies on the calls that Brian made to Curran before and after the transfer. But the purpose of the mid-April call, which Brian says Renae knew about, was to discuss whether it would be better to file for bankruptcy or sell the farm to Cody. Divorce was not discussed until Brian's meeting with Curran in July,

close to a month after the transfer was completed. While that meeting was set up just a few days after the closing on the farm, Brian denied that he walked into Curran's office intending to divorce Renae. Instead, after receiving his first-ever call from a bill collector, he wanted advice from Curran about "[h]ow to handle this debt that just keeps coming in." When Curran mentioned divorce, Brian testified that he "wanted to go home and think about it, and I thought about it from that day until the time I done it." During that time, "all the bills came, still kept coming," until he "had enough." Cody corroborated this, testifying that although he never heard his father mention a divorce before the transfer, his parents' arguments about finances "got a lot worse . . . after the farm was sold." He heard them discussing "credit card bills" several times "and not being very happy about the large dollar amounts."

Moving on to the fourth indicia of fraud relied on by Renae, the transfer of the farm to the couple's son did reduce their marital assets from $2,485,000 to $489,568.71. Yet all the evidence shows that Renae knew they were making a substantial gift to Cody when the farm was transferred. As the district court found:

> Renae was an active participant in the transfer deal and had both the benefit of reviewing the documents herself and opportunity to discuss the details with [the closing attorney]. It appears to the court that Renae only began to become dissatisfied with the deal when the interpersonal conflicts in the family escalated after the transfer occurred. The court concludes that it was only upon suggestion of counsel and her family that Renae came to the conclusion that she "believed" that Brian had committed fraud.

The final indicia of fraud that Renae relies on to support her claim is that "the transfer occurred shortly before the substantial debt was incurred." *Id.* § 684.4(2)(j). From the start of its analysis, the court stated it was "skeptical of the

timing of Brian and Renae's transfer of the real estate in relationship to Brian's filing for divorce." Even through that lens, and after thoroughly reviewing the testimony and evidence, the court concluded:

> Renae's active participation in the transaction undercuts her argument. . . . The court finds Renae's denial of knowledge of the parties' net worth, her involvement in the discussions[,] and transactions to be disingenuous. Renae is requesting that the court rewrite history in a manner that would be more favorable to her and in contradiction to the facts as determined by the court. Therefore, the court determines that Renae has failed to prove the transfer she and Brian made is a voidable transfer under section 684.4.

We reach the same conclusion on our de novo review of the record. While there are one or two factors in section 684.4(2) that may have supported Renae's suspicions, on the whole, Brian and Cody provided a satisfactory explanation for the circumstances accompanying the transfer of the farm: a desire for Brian to get out of farming because of the financial stress it was causing him while continuing "the family's history of gifting part of [their] farming assets to their children" so that the multi-generational farming tradition could be preserved. *See Algreen*, 2018 WL 3057438, at *3. We accordingly affirm the dismissal of Renae's voidable-transfer claim.

## B.      Intentional Misrepresentation and Undue Influence

In challenging the dismissal of her intentional-misrepresentation and undue-influence claims, Renae concentrates on the district court's failure to find that a confidential relationship existed between her and Brian.

If a claimant can prove a confidential relationship exists, "the effect of such a relationship is to raise a presumption of fraud and undue influence and shift the burden to the party seeking to uphold the transaction . . . to establish by clear and

convincing evidence that the transaction was entered into voluntarily." *Punelli*, 364 N.W.2d at 261. But first, Renae bore "the burden to show by clear proof the existence of a confidential relationship in which she was the subservient and [Brian and/or Cody] the dominant person." *Id.* That Brian and Renae were married is not, by itself, sufficient to prove a confidential relationship existed. *Id.* "A confidential relationship arises 'when one person has gained the confidence of another and purports to act or advise with the other's interest in mind.'" *Id.* (quoting *Oehler v. Hoffman*, 113 N.W.2d 254, 256 (Iowa 1962)).

Citing *Jensen v. Jensen*, No. 02-1538, 2003 WL 22346671, at *3 (Iowa Ct. App. Oct. 15, 2003), a case having to do with breach of fiduciary duties, Renae argues the burden in this intentional-misrepresentation and undue-influence case should have shifted because Brian had "closer access to the facts." She also points to her lack of communication with the legal and tax professionals before closing and Brian's representations to them that he was acting for Renae. The evidence contradicts her arguments.

Renae testified that she was unaware of almost all the details of the transaction—the purchase price, the amount of the gift they were making to Cody, and even the date of the closing. She said that she felt pressured to sign the closing documents because "after being married for almost 25 years, if Brian said it was something that needed to be done on the farm, that's what I did." According to Renae, Brian left her in the dark with almost everything having to do with the farm. But as the district court found, Renae's testimony was disputed by every professional involved with the sale.

Pabst, the attorney who handled the closing, testified that "Renae gave me the figures . . . the payoffs and things such as that, so I asked her to make 100 percent right on that at the closing. And she went over it . . . ." He continued,

> I told her exactly what I needed. She got it. She did as good a job as what I would call a professional closer.
> Q. And you're certain of that? A. Yeah. Yeah. She seemed just fine to me. She had all the information, and especially the wiring instructions, and she got it to me, I'm going to guess, a day or two in advance.

Pabst said that Renae did not make any statements at the closing that suggested she did not know what was going on. Instead, she seemed to Pabst "to be a person who wanted to make sure that everything was done right, so she took time to look at the documents, make certain that everything was done correctly."

The couple's long-time accountant testified similarly. He said that Renae was typically the one who brought in the tax information that he needed each year. He never noticed Brian dominating Renae in his interactions with them. The accountant agreed "they had equal knowledge position in regard to their data for the tax return." And when he reviewed the couple's 2019 taxes with them, which included a discussion about preparing a gift tax return, the accountant said that Renae did not express any surprise or concern at the gift amount.

In short, no one at the closing testified there was any indication that Renae was unaware or incapable of understanding the details of the transfer. And witnesses who were familiar with Renae and Brian on a personal level, like her parents, described her as highly intelligent, educated, and generally not susceptible to undue influence. Though Renae's parents were concerned about

her stress levels and health, Renae acknowledged that none of her conditions affected her cognition.

These facts simply don't fit within those where a confidential relationship was found. *See, e.g.*, *In re Estate of Clark*, 357 N.W.2d 34, 37–38 (Iowa Ct. App. 1984) (collecting cases). We accordingly agree with the district court that there was no confidential relationship between Brian and Renae. There was thus no obligation to apply the burden-shift in this case. *Punelli*, 364 N.W.2d at 261. Because Renae conceded at oral argument that her intentional-misrepresentation and undue-influence claims could not proceed without the finding of a confidential relationship, we affirm the district court's dismissal of these two claims.

## IV.    Conclusion

On our review of the record, we find the district court did not err in dismissing Renae's claims for voidable transfer, intentional misrepresentation, and undue influence.

**AFFIRMED.**